IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
November 7, 2023 Session

**ROBERT FERGUSON v. M. BROWN CONSTRUCTION, INC. ET AL.**

**Appeal from the Circuit Court for Cheatham County**
No. 6442     Larry J. Wallace, Judge
_____

**No. M2022-01637-COA-R3-CV**
_____

A property owner hired a local contractor to build a custom-designed home. A payment dispute arose midway through construction, and the contractor stopped working. The owner paid others to repair and complete the home. Then he filed suit against the contractor asserting multiple theories of recovery. Among other things, the trial court found the contractor liable for breach of contract and fraudulent misrepresentation. As compensatory damages, it awarded the owner the additional costs he incurred to repair and complete the home above the contract price. We affirm in part, vacate in part, and remand for recalculation of compensatory damages.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in Part; Vacated in Part; Case Remanded**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which ANDY D. BENNETT and JEFFREY USMAN, JJ., joined.

Paul T. Housch, Nashville, Tennessee, for the appellant, Timothy Brown.

Harold E. Rushton, Nashville, Tennessee, for the appellee, Robert Ferguson.

**OPINION**

**I.**

**A.**

Robert Ferguson sued M. Brown Construction, Inc., Michael Brown, and Timothy Brown, asserting claims for negligence, conversion, breach of contract, fraudulent and

negligent misrepresentation, and violation of the Tennessee Consumer Protection Act. *See* Tenn. Code Ann. § 47-18-109(a)(1) (Supp. 2024). According to the operative complaint,[1] Tim and Michael Brown built houses as employees or agents of M. Brown Construction, Inc., a family-owned business. Mr. Ferguson signed a written contract with M. Brown Construction for the construction of his home. Tim Brown signed the contract on the corporation's behalf. But the contractor did not finish the specified work. And the work was defective, requiring expensive repairs. In the aftermath, Mr. Ferguson discovered that neither Tim Brown nor M. Brown Construction were properly licensed for the project. *See id.* § 62-6-103(a)(1) (2019). He sought compensatory and punitive damages, treble damages under the Consumer Protection Act, and costs and attorney's fees.

For their part, the defendants denied liability. And, on the eve of trial, they asserted a counterclaim for unjust enrichment, alleging that Mr. Ferguson failed to pay for completed work.

B.

At trial, Mr. Ferguson and his wife, Roxanna Ferguson, maintained that they hired Tim Brown to build their home, not M. Brown Construction. After reviewing the design plans, Tim Brown assured the Fergusons that he was qualified to build their home. He claimed to have extensive experience with large residential construction projects. And he showed them a portfolio of his previous builds. Based on these assurances, the Fergusons chose Tim Brown to build their custom home.

Mr. Brown provided the Fergusons with a project quote based on their design plans. Armed with the contractor's bid, the Fergusons applied for a construction loan. But their initial application was denied, at least in part, because of the estimated cost of the construction. The lender also required a signed contract reflecting the contractor's contact information, license number, and insurance information.

The Fergusons notified Mr. Brown, who agreed to revise his quote. He also drafted a construction contract using the license and insurance information of his brother's company. According to the contract, M. Brown Construction, Inc. would "provide material, labor and complete job as specified [in the custom plans] for . . . $263,299.68." The contract identified "Tim Brown" as "a Representative" for the company and the designated "contact for all [c]onstruction and money draws." When the Fergusons questioned the identification of the contractor, Mr. Brown explained that this was just "standard procedure" to satisfy the lender. Both Mr. Brown and Mr. Ferguson signed the contract on June 28, 2015.

---

[1] After Michael Brown's death, Mr. Ferguson amended his complaint to substitute Michael Brown's estate and children as defendants.

2

Tim Brown agreed that the Fergusons hired him as their contractor, not his brother's company. But, as he explained, because he did not have a contractor's license, he "[u]sed [his] brother's license to get the loan, so [he] . . . could build [the Ferguson home]." He acknowledged that Michael Brown was the sole owner of M. Brown Construction. Tim Brown had never been an employee, officer, member, or agent of the company. Still, he routinely built houses using the company's license and insurance information.

Beyond the question of Tim Brown's authority to involve the company, M. Brown Construction's license had a monetary limit of only $180,000. Although the contract price exceeded that limit, Tim Brown was not concerned with this deficiency. He insisted that the monetary limit applied separately to each permit pulled for the project, not the total project cost.

The lender approved the revised application in October. And Mr. Ferguson gave Mr. Brown a $10,000 deposit to begin construction. As Mr. Brown requested, all checks were made payable to "Tim Brown" individually.

Unable to begin construction immediately, Mr. Brown signed the deposit check over to Mr. Ferguson. Mr. Ferguson used the money to obtain a building permit. He also hired Terry Wallace, a local mason, to build the home's foundation. The Fergusons claimed that Mr. Brown directed them to take these steps. Mr. Brown disputed their claims. As he told it, the Fergusons were so anxious for construction to begin that they started without him.

Still, Mr. Brown admitted that he had planned to hire Mr. Wallace as the foundation subcontractor on the Ferguson project. And he supervised the subcontractor's work. At Mr. Brown's direction, the subcontractor added multiple stone piers to the foundation, a deviation from the design plans. According to Mr. Brown, this change was necessary to provide greater support for the wooden trusses he planned to use during construction instead of the steel beams called for in the plans.

The Fergusons complained that Mr. Brown also deviated from the plans in other ways. He lowered the ceiling heights throughout the home. He changed the flooring on the back patio from concrete to wood. And he eliminated some architectural details such as columns for built-in shelving. Feeling they had no other choice, the Fergusons acquiesced to these unilateral changes.

During construction, Mrs. Ferguson paid Mr. Brown upon request. After the initial deposit, she paid him another $110,000 for his materials and labor. She claimed she also paid other suppliers for various materials, supplies, and fixtures at Mr. Brown's direction. Among other things, the Fergusons purchased windows, doors, and cabinets for the home. They insisted that nothing was purchased for the home without Mr. Brown's approval.

3

Proof at trial revealed that financial concerns ultimately derailed the project. Mrs. Ferguson recalled that a few months into construction, Mr. Brown told her to pay an overdue invoice for drywall materials at Midway Supply. Mrs. Ferguson complied, but she questioned why Mr. Brown had not paid the invoice with a previous draw. He reportedly told her that sometimes he had to "rob Peter to pay Paul." And he asked for an additional $30,000 to continue construction. But Mrs. Ferguson had exhausted the proceeds from the construction loan. And, by her estimate, the house was only about 40% complete. The Fergusons refused Mr. Brown's request, which they perceived as a demand for additional funds above the contract price. And Mr. Brown walked off the job.

As the Fergusons attempted to complete construction without a contractor, they encountered problems with Mr. Brown's workmanship. Uneven subflooring had to be replaced before hardwood floors could be installed. Several windows were inoperable. The roof leaked and ruined the drywall in two rooms. And the plumbing failed inspection.

Including the payments to Mr. Brown, the Fergusons claimed they ultimately spent a grand total of $406,600.08 to complete their custom home. This total included the cost of repairing defects in the construction. Mrs. Ferguson submitted cancelled checks, receipts, and invoices that reflected their expenditures. She also created a spreadsheet detailing each expense. She acknowledged that the contract excluded costs associated with clearing the land, grading for the driveway, landscaping, and the well. And she testified that, although she tried to eliminate from her calculations costs that were beyond the scope of the contract, some of those costs were mistakenly included.

Tamika Parker, a licensed engineer, inspected the Ferguson home before trial. Admitted as an expert in residential construction, Ms. Parker identified multiple deviations from the design plans. In her opinion, some of these deviations were dangerous. Others merely impacted the aesthetics of the home. Deviations in the foundation and framing coupled with a lack of precision in the work caused her to question the structural integrity of the home. In her opinion, gravity was the only force keeping the home intact. She recommended several remedial measures. She also identified significant tripping hazards caused by poor construction of a staircase and the change from concrete to wood flooring for the back patio. And she noted several flaws in the roofing.

Mr. Brown defended his workmanship. As he explained, he built the Ferguson home "to code," not to satisfy a higher engineering standard. He pointed out that the home passed inspection while he was on site. He blamed any problems with the roof on the unusual design plans. Although he was aware that the roof leaked in one area, he insisted that he took steps to alleviate the problem before he installed the drywall. To his knowledge, the house was dry when he left the job site. Any problems with the windows he attributed to product defects, not installation. He also blamed the Fergusons' door choice for the tripping hazard at the back door. And he insisted that the Fergusons approved his deviations from the design plans.

4

Except for the drywall invoice, Mr. Brown claimed he never directed the Fergusons to buy materials or supplies for the build. And he only asked Mrs. Ferguson to pay for the drywall because he was out of town on vacation. Mr. Brown maintained that the Fergusons paid him a total of $110,000 during this project. And he only stopped work because they refused to pay him as specified in the contract.

C.

The court ruled in favor of the Fergusons. It found that Tim Brown was the primary contractor on the Ferguson home. He personally directed and supervised the construction. By his own admission, he drafted the contract in the company name for the sole purpose of circumventing the statutory licensure requirement. He had never been an officer, employee, or agent of his brother's company. As such, he "did not have authority to enter the contract on behalf of the corporation."

The court found that Mr. Brown offered to construct the Fergusons' custom-designed home for a fixed price. And he misled Mr. Ferguson about his licensure status. In reliance on Mr. Brown's representations, Mr. Ferguson accepted his offer. Yet Mr. Brown failed to fulfill his contractual obligations. And he unlawfully engaged in contracting activity in violation of the licensure statute. *See* Tenn. Code Ann. § 62-6-103(a)(1).

Based on the proof at trial, the court found Tim Brown individually liable for breach of contract and fraudulent misrepresentation. It also found that his conduct constituted constructive fraud, negligence per se, and a violation of the Tennessee Consumer Protection Act. *See id.* § 47-18-104(b)(35) (Supp. 2024).

The court determined that the additional costs Mr. Ferguson incurred to repair and complete the construction after Mr. Brown ceased work was an appropriate measure of damages. It found that Mr. Ferguson proved that he "incurred total costs to repair and build the home in the amount of $406,600.08," which was $143,300.50 more than the contract price. So the court awarded Mr. Ferguson compensatory damages of $143,300.50 as well as double damages under the Consumer Protection Act. *See id.* § 47-18-109(a)(3)-(4).

The court dismissed all defendants other than Tim Brown. It also dismissed Mr. Brown's counterclaim for lack of proof. As an unlicensed contractor, Mr. Brown was limited to recovering his documented expenses as established by clear and convincing evidence. *Id.* § 62-6-103(b). And he "failed to prove by clear and convincing evidence that he paid for any expenses on the Ferguson project."

## II.

On appeal, Mr. Brown attacks the judgment against him on multiple fronts. He challenges the court's findings with respect to fraudulent misrepresentation, constructive fraud, and breach of contract. He insists the court erred in awarding damages against him individually. And he questions the amount of compensatory damages awarded.[2]

Because this was a bench trial, our review is de novo on the record with a presumption that the trial court's factual findings are correct, unless the evidence preponderates otherwise. TENN. R. APP. P. 13(d). We review questions of law de novo with no presumption of correctness. *Kaplan v. Bugalla*, 188 S.W.3d 632, 635 (Tenn. 2006).

## A.

### 1. Fraudulent Misrepresentation

Mr. Brown contends that the proof of fraudulent misrepresentation fell short. To recover under this theory of liability, Mr. Ferguson had to prove:

> (1) that the defendant made a representation of a present or past fact; (2) that the representation was false when it was made; (3) that the representation involved a material fact; (4) that the defendant either knew that the representation was false or did not believe it to be true or that the defendant made the representation recklessly without knowing whether it was true or false; (5) that the plaintiff did not know that the representation was false when made and was justified in relying on the truth of the representation; and (6) that the plaintiff sustained damages as a result of the representation.

*Hodge v. Craig*, 382 S.W.3d 325, 343 (Tenn. 2012).

The court determined that Tim Brown "committed fraudulent misrepresentation when he made false or misleading statements to Mr. Ferguson regarding his qualifications to build the . . . home." Mr. Brown represented that he was a "building contractor . . . [with] extensive experience [in] . . . construction and contracting work." "[T]hrough his words, actions and overall conduct[,]" Mr. Brown "led [Mr. Ferguson] . . . to believe he was a licensed Tennessee home builder, when in fact he was not." He also "led [Mr. Ferguson] to believe that he had extensive experience building homes even larger than

---

[2] Mr. Ferguson asks this Court for an award of attorney's fees and costs on appeal. An appellee properly requests an award of attorney's fees on appeal "by raising it in the body of the brief, adequately developing the argument, and specifying that relief in the brief's conclusion." *See Charles v. McQueen*, 693 S.W.3d 262, 284 (Tenn. 2024). Because Mr. Ferguson failed to do so, this issue has been waived.

the Ferguson home, when in fact that was not true." Mr. Ferguson "relied upon those assertions in making his decision to hire . . . [Mr.] Brown." And Mr. Ferguson incurred damages because of Mr. Brown's deception.

Mr. Brown claims he only told Mr. Ferguson that he "could build his new home." As such, Mr. Brown asserts that Mr. Ferguson failed to establish the first two elements of his fraud claim. But the proof showed otherwise. Mr. Brown assured the Fergusons that he was a qualified builder with extensive experience on large residential construction projects. This was not true. And he drafted a contract using his brother's license number solely to avoid the licensure requirement. Through his words and actions, he misled the Fergusons about his qualifications to build their home.

Mr. Brown also challenges the proof of actual reliance. Using the contract language to his advantage, he now insists that the Fergusons could not have relied on his representations because they hired another entity to build their home. We do not find his argument persuasive. Mr. Brown readily admitted at trial that he drafted the contract in the name of his brother's company to satisfy the Fergusons' lender so that the Fergusons would hire him for the job. There was ample proof at trial that the Fergusons hired Mr. Brown to build their home. And they did so in reliance on his representations.

2. Constructive Fraud

Mr. Brown also challenges the court's constructive fraud finding. Constructive fraud, as its name suggests, is a type of fraud. *Alley v. Connell*, 40 Tenn. 578, 582, (1859); *Kincaid v. SouthTrust Bank*, 221 S.W.3d 32, 39-40 (Tenn. Ct. App. 2006); *Clore v. The Vill., Inc.*, No. C.A. 117, 1986 WL 4590, at *6 (Tenn. Ct. App. Apr. 18, 1986). It differs from actual fraud only in the element of intent. *Kincaid*, 221 S.W.3d at 39; *see also McCord v. Nashville, C. & St. L. Ry.*, 213 S.W.2d 196, 206 (Tenn. 1948) (describing constructive fraud as "an elusive creature of equity characterized by an absence of intent"). As an equitable doctrine, it is particularly useful "for the purpose of canceling or rescinding transactions where there has been an overreaching or undue advantage taken between parties who are not dealing at arm's length." *Land Devs., Inc. v. Maxwell*, 537 S.W.2d 904, 918 (Tenn. 1976).

Mr. Ferguson first raised this theory of liability in his opening statement at trial. Yet he requested no additional relief on this basis. And the court awarded none. The court appears to have made the constructive fraud finding to ensure that the judgment would not "be dischargeable in bankruptcy." *See* 11 U.S.C. § 523(a)(2)(A) (providing a fraud exception to the bankruptcy discharge).

Because Mr. Ferguson requested no equitable relief and an award of damages was an adequate remedy here, we vacate the constructive fraud finding. The proof at trial supported the court's finding of actual fraud. *See Hodge*, 382 S.W.3d at 342 (explaining

that "'intentional misrepresentation,' 'fraudulent misrepresentation,' and 'fraud' are different names for the same cause of action"). As the defrauded party, Mr. Ferguson had a choice of remedies. He could "treat the contract as voidable and sue for the equitable remedy of rescission or . . . treat the contract as existing and sue for damages at law under the theory of 'deceit.'" *Vance v. Schulder*, 547 S.W.2d 927, 931 (Tenn. 1977). Mr. Ferguson chose the latter option. As he was successful, the constructive fraud finding served no purpose. *See Groover v. Torkell*, 645 S.W.2d 403, 409 (Tenn. Ct. App. 1982) (noting that "[t]o say that [the defendant's conduct] also amounts to a constructive fraud is redundant and adds nothing to the available remedies of the plaintiff").

B.

1. Written Contract

The trial court also found Mr. Brown liable for breach of contract. Mr. Brown questions the court's finding that he committed the first material breach. "Whether a party has fulfilled its obligations under a contract or is in breach of the contract is a question of fact." *Forrest Constr. Co. v. Laughlin*, 337 S.W.3d 211, 225 (Tenn. Ct. App. 2009). We look to the contract to ascertain each party's responsibilities. *Id.* at 221.

As previously discussed, Mr. Brown maintains on appeal that he was not a party to the written contract. Contract interpretation is a question of law, which we review de novo. *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999). Here, the contract terms are clear and unambiguous. *See Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 611 (Tenn. 2006) (explaining that contract terms are ambiguous when they are "susceptible to more than one reasonable interpretation"). So we must interpret the contract according to the "plain meaning of the words in the document." *Id.* On its face, the written contract was between Mr. Ferguson and M. Brown Construction, Inc. And it identified Mr. Brown as the company representative on the project.

Mr. Brown insists that he signed the contract only in a representative capacity. Nothing in the contract language suggests otherwise. *See Brown v. Mays*, 241 S.W.2d 871, 873 (Tenn. Ct. App. 1949) (explaining that "depending on the intention of the parties manifested by the terms of the contract" a contract made by an agent for a disclosed principal "may bind the agent alone, or the principal alone, or both together"). Ordinarily, contracts signed by an agent for a disclosed principal are binding on the principal alone. *Holt v. Am. Progressive Life Ins. Co.*, 731 S.W.2d 923, 925 (Tenn. Ct. App. 1987). But a principal cannot be "bound by a contract made by a person who is not his agent." *Regions Bank v. Bric Constructors, LLC*, 380 S.W.3d 740, 764 (Tenn. Ct. App. 2011). And the evidence does not preponderate against the court's finding that Mr. Brown lacked authority to bind his brother's company. *See Jack Daniel Distillery, Lem Motlow, Prop. v. Jackson*, 740 S.W.2d 413, 416 (Tenn. 1987) (holding that "the burden of proof is on the party asserting agency").

8

Even so, Mr. Brown's lack of authority, without more, does not override the plain meaning of the contract. "[T]he fact that an agent acted without power to subject the principal to liability does not make the agent a party to the contract." RESTATEMENT (THIRD) OF AGENCY § 6.01 cmt. b (AM. LAW INST. 2006). Mr. Brown may be personally liable for breach of an implied warranty of authority, but he cannot be held liable for breach of this written contract. *See Memphis Cotton Press & Storage Co. v. Hanson*, 4 Tenn. App. 293, 302 (1926); RESTATEMENT (THIRD) OF AGENCY § 6.10 (AM. LAW INST. 2006) (describing an agent's implied warranty of authority).

2. Oral Contract

This conclusion does not end our contract analysis. As he readily admitted at trial, Mr. Brown orally agreed to build the Ferguson home as provided in the written contract. The Fergusons accepted his offer. An oral contract is enforceable when its terms are sufficiently definite. *Castelli v. Lien*, 910 S.W.2d 420, 426 (Tenn. Ct. App. 1995).

As his next argument, Mr. Brown complains that Mr. Ferguson committed the first material breach by paying the deposit late and usurping his role as prime contractor. Even if we were to agree with Mr. Brown on this point, we conclude he waived his right to make this argument. "A non-breaching party may . . . waive its right to assert first material breach as a bar to recovery if it accepts the benefits of the contract with knowledge of a breach." *Madden Phillips Const., Inc. v. GGAT Dev. Corp.*, 315 S.W.3d 800, 813 (Tenn. Ct. App. 2009). And here, Mr. Brown moved forward with construction fully aware of Mr. Ferguson's actions.

The trial court found that Mr. Brown committed the first material breach of contract "when he knowingly entered into the contract to build the [Ferguson] home without first obtaining licensure to do so." This conduct may have violated the licensure statute. *See* Tenn. Code Ann. § 62-6-103(a)(1). But it was not a breach of contract. "The rights and obligations of contracting parties are governed by their . . . agreements." *Hillsboro Plaza Enters. v. Moon*, 860 S.W.2d 45, 47 (Tenn. Ct. App. 1993). A breach occurs when one party fails to fulfill a contractual obligation. *See Fed. Ins. Co. v. Winters*, 354 S.W.3d 287, 291 (Tenn. 2011) (explaining that a breach of contract action requires proof of "deficiency in the performance amounting to a breach"); *McClain v. Kimbrough Constr. Co.*, 806 S.W.2d 194, 199 (Tenn. Ct. App. 1990) (reasoning "[o]nly [one party's] uncured material failure to perform its own contractual obligations would have excused [the other party] from performing its remaining obligations"). Here, the parties' agreement did not expressly require Mr. Brown to comply with the licensure statute.

We recognize that an "implied covenant of good faith and fair dealing is imposed in the performance and enforcement of every contract." *Dick Broad. Co. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 668 (Tenn. 2013). And "each party to a contract promises to perform

9

its part of the contract in good faith." *Barnes & Robinson Co. v. OneSource Facility Servs., Inc.*, 195 S.W.3d 637, 642 (Tenn. Ct. App. 2006). But the duty of good faith does not apply to the negotiation or formation of a contract. *Wallace v. Nat'l Bank of Commerce*, 938 S.W.2d 684, 687 (Tenn. 1996); *Barnes & Robinson Co.*, 195 S.W.3d at 643. So Mr. Brown did not breach the implied duty of good faith and fair dealing "by bidding and offering to build the Ferguson home without first obtaining licensure."

Even so, we agree that Mr. Brown committed the first material breach of contract. Mr. Brown promised the Fergusons he would build them a custom home for a fixed price. Yet he never completed the home, and much of the work was defective. A contractor has an implied duty to perform the work skillfully, carefully, and in a workmanlike manner. See *Fed. Ins. Co.*, 354 S.W.3d at 291-93. Here, the court found numerous defects in the construction. The roof and the plumbing leaked. There was a significant tripping hazard at the back door. And Mr. Brown made unilateral changes to the home's foundation that jeopardized the structural integrity of the home.

Mr. Brown blamed his failure to complete construction on the Fergusons' failure to pay him as specified in the contract. But the court credited the Fergusons' testimony that Mr. Brown directed them to pay others directly for both materials and labor on the project. And when Mr. Brown requested another $30,000, they had already paid the full contract price. The Fergusons supported their testimony with documentary evidence such as cancelled checks, receipts, and invoices. We recognize that Mr. Brown testified differently, but we discern no basis to disturb the court's finding. *See Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999).

In sum, the court did not err in finding Mr. Brown individually liable for breach of contract. Mr. Brown orally agreed to construct the Ferguson home for a fixed price. And he materially breached the contract by failing to complete construction and performing defective work.

C.

Initially, Mr. Brown complains that the court erred in awarding damages against him personally for breach of contract. Given the foregoing analysis, we discern no error. Besides, the court also found Mr. Brown liable for fraudulent misrepresentation. So the court could have made a similar award based on that theory of recovery. *See Boling v. Tenn. State Bank*, 890 S.W.2d 32, 35 (Tenn. 1994); RESTATEMENT (SECOND) OF TORTS § 549 (AM. LAW INST. 1977); *see also Shahrdar v. Glob. Hous., Inc.*, 983 S.W.2d 230, 238 (Tenn. Ct. App. 1998) (noting "the Plaintiff is only entitled to one recovery" when the damages claimed under multiple theories of recovery overlap).

Mr. Brown also challenges the amount of compensatory damages awarded.[3]  The amount of damages awarded is a question of fact.  *Poole v. Union Planters Bank, N.A.*, 337 S.W.3d 771, 789 (Tenn. Ct. App. 2010).  Mr. Brown argues that the evidence does not support the court's finding that Mr. Ferguson's total cost to complete and repair the home was $406,600.08.  And Mr. Brown submits that this figure improperly included costs for items outside the scope of work.

Mr. Ferguson asserts that Mr. Brown waived this issue by failing to object to the introduction of his damages evidence at trial.  A litigant's "[f]ailure to object [to] evidence in a timely and specific fashion precludes taking issue on appeal with the admission of the evidence."  *Grandstaff v. Hawks*, 36 S.W.3d 482, 488 (Tenn. Ct. App. 2000).  But Mr. Brown does not challenge the admission of this evidence.  Rather, he complains that the evidence does not support the court's finding.

It was Mr. Ferguson's burden to prove his damages.  *Discover Bank v. Morgan*, 363 S.W.3d 479, 496 (Tenn. 2012).  The Fergusons testified that they spent $406,600.08 to repair and finish construction.  In support of their testimony, Mrs. Ferguson submitted copies of cancelled checks, receipts, and invoices, as well as a spreadsheet listing and identifying their asserted costs.  She acknowledged the spreadsheet listed three payments for the installation of a well on the property.  But she explained that those payments had been excluded from the spreadsheet total.  And the record supports her testimony on this point.

Mr. Brown questioned Mrs. Ferguson extensively about her calculation of total costs.  She acknowledged that the spreadsheet contained some inadvertent errors.  Specifically, she admitted that the cost of grass, gravel, gardening tools, and straw should have been excluded from the spreadsheet total.  She also conceded that two other invoices, one for stone and one for framing, should not have been included.  The court erred in not excluding these costs.

But we cannot fault the court for failing to exclude the cost of purchasing windows and doors for the Ferguson home.  The Fergusons claimed Mr. Brown directed them to purchase these items, which were included in the contract price.  Although Mr. Brown testified otherwise, the court credited the Fergusons' testimony.  We will not disturb the court's credibility finding on this record.  *See Wells*, 9 S.W.3d at 783.

And while Mr. Brown complains that the Fergusons also included furniture costs in

___

[3] Mr. Brown failed to properly challenge the measure of damages.  So that issue is waived.  *See Hodge*, 382 S.W.3d at 335 (recognizing "[a]n issue may be deemed waived, even when it has been specifically raised as an issue, when the brief fails to include an argument satisfying the requirements of Tenn. R. App. P. 27(a)(7)").

11

their total, he did not alert the trial court to this issue.  So he cannot raise this complaint on appeal.  *See* TENN. R. APP. P. 36(a).

Because the evidence preponderates against the court's calculation of damages, we vacate the award of $143,300.50 in compensatory damages.  On remand, the court should recalculate the Fergusons' damages based on the proof at trial.  Specifically, the court should subtract from the Fergusons' asserted total cost any amounts Mrs. Ferguson admitted were not included within the contract scope.

## III.

We affirm the court's decision to hold Mr. Brown individually liable for breach of contract and fraudulent misrepresentation.  We vacate the constructive fraud finding and the award of compensatory damages for breach of contract.  This case is remanded for recalculation of damages and further proceedings consistent with this opinion.

_s/ W. Neal McBrayer_
W. NEAL MCBRAYER, JUDGE
